**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00098 (TFH)** |
| **v.** | : | |
| | : | |
| **ANDREW HATLEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Andrew Hatley to two months' home detention, three years of supervised probation, 60 hours community service, and $500 in restitution.

## I.    Introduction

The defendant, Andrew Hatley, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Andrew Hatley pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of home detention is appropriate in this case because the defendant entered the Capitol through a window in the Senate Wing, with a large group of rioters, and walked through a hallway to the Crypt of the building; however, he was in about the building for about 15 minutes and has been cooperative with law enforcement.

1

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's entry into the Capitol through a window near the Senate wing door wearing a respirator mask renders a home detention sentence, rather than simply probation, necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Andrew Hatley's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Andrew Hatley traveled to Washington, D.C., from his residence in South Carolina to attend the "Stop the Steal" rally. On January 6, he went to the rally and heard former President Trump speak. After Mr. Trump finished speaking, Mr. Hatley heard from others surrounding him that people were going to the U.S. Capitol. He decided to walk to the building with others.

Once there, he walked up the steps on the western side of the building. Mr. Hatley later noted, in a voluntary interview with the FBI, that he could see it was a chaotic situation. Indeed, he later described it as "very overwhelming." He could see multiple people on scaffolding and could also see people banging on windows and doors to the Capitol. The defendant stood behind a large crowd that was trying to get inside the building. He then saw people entering the building through a window. That location was first breached by other rioters as depicted below:



Approximately thirty-five minutes after this breach, the defendant climbed through one of the smashed windows and into the hallway. The defendant climbed in behind a large crowd of rioters who had already climbed in before him. A screenshot of that entry is reproduced below. The defendant is adjusting a black cowboy hat and wearing a green respirator mask:



The defendant took a selfie of himself shortly after entering. That photograph is reproduced below:



In that hallway, there was a large group of rioters standing in front of a police line.  As the defendant subsequently told the FBI, rioters were shouting and singing songs.  The defendant stood near the back of the crowd. He then climbed back out of the window, stood outside of the window for about two minutes, and climbed back in. After climbing back in, he walked down a hallway towards the Crypt. The defendant estimated that he walked about 100 yards through the hallway to the Crypt. Once inside the Crypt, the defendant could see that it was a "chaotic" situation, as he later told the FBI. The defendant took a picture of himself in front of a statue of John Calhoun. That picture is reproduced below (the defendant appears on the right):



According to the defendant, a person who appeared to be an employee at the Capitol told him he should leave. The defendant exited the Crypt and walked back down the hallway towards the window that he had climbed through. Surveillance video shows him walking out of the door next to that window. All told, the defendant was in the Capitol Building for about 15 minutes.

In the Statement of Offense accompanying his guilty plea, the defendant admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so and that he paraded, demonstrated, or picketed within the building.

On January 15, 2021, the government obtained a warrant for the defendant's arrest. The defendant is a truck driver who often drives throughout the country. When the FBI called the defendant to notify him of the warrant, the defendant agreed to halt his route and remain in Arizona (where he was at the time) over a holiday weekend and turn himself in to the FBI the next business

day so that he could be seen in the U.S. District Court for the District of Arizona. He did so without incident.

On May 4, 2021, the defendant voluntarily interviewed with the FBI. He gave a full account of his actions before and during the events of January 6. His account is consistent with CCTV footage from the Capitol. The defendant spoke in a remorseful tone about his activity that day. He also admitted that his conduct on January 6 was a mistake and that he did not exercise good judgment in deciding to go to the Capitol Building that day.

*The Charges and Plea Agreement*

On January 15, 2021, Andrew Hatley was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 19, 2021, he was arrested after turning himself in in Arizona. On February 9, 2021, he was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 14, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Mr. Hatley agreed to pay $500 in restitution to the Department of the Treasury.

**III.   Statutory Penalties**

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.[1] The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545

---

[1] Because Mr. Hatley has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of home detention.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Here, the defendant entered the building behind a large crowd after the entrance had already been breached. There is no evidence that he is engaged in any violence or destruction or that he encouraged others to do so. The defendant walked down a hallway into the Crypt, where he took a picture, before walking back down the hallway and exiting.

However, although the defendant was only in the building for about 15 minutes, his entry was not uneventful. He climbed through a window that had been smashed open approximately thirty-five minutes earlier. The defendant chose to walk through a hallway in the Capitol despite the fact that, as he later admitted, the scene as a whole that day was chaotic. Before he entered the Capitol, the defendant could see multiple people on scaffolding and could also see people banging

on windows and doors to the Capitol. Indeed, he later described the scene as "very overwhelming." Once he entered the building, he was standing amongst a large crowd, many of whom had flags and were shouting and singing. A line of Capitol Police officers was standing in front of the crowd. To be sure, the defendant was near the back of this crowd, and there is no evidence that he himself had any negative interactions with police. But he should have known that he should not have been in the building at that point. Indeed, he exited for about two minutes before re-entering through the same window.

The defendant also did not remain in the hallway. He traveled, by his own estimation, approximately 100 yards to the Crypt and took a picture of himself in front of the statue shown above. Again, the defendant should have known at this point that the situation in the Capitol was volatile, yet he chose to remain part of the crowd. Indeed, he later described the scene in the Crypt as "chaotic." His posing for a picture underscores the lack of seriousness that he showed towards the incident at that time.

On the other hand, the defendant exited the building shortly thereafter. He has also shown remorse for his actions. He voluntarily interviewed with the FBI, and he conveyed remorse for his actions that day. He admitted that his conduct on January 6 was a mistake and that he did not exercise good judgment. The defendant has expressed similar sentiments in hearings before this Court.

The government would also note that the defendant voluntarily turned himself in to the FBI in Arizona, which was not his place of residence. He halted his truck-driving route and waited over a long weekend before abiding by his agreement to turn himself in on the next business day.

Many of the nature and the circumstances of the defendant's conduct are troubling, but on the other hand, he has participated in the riot to a lesser degree than many defendants have and has

shown remorse since then. This factor weighs in favor of a sentence that is greater than probation but less than incarceration.

### B.   The History and Characteristics of the Defendant

As set forth in the PSR, the defendant has no criminal record. He currently works as a truck driver. He has described his job both in the PSR and in Court as "all he has." PSR at ¶ 49. The defendant stays at the home of an acquaintance in South Carolina when he is not driving his truck. After this case was charged, a probation officer met the defendant and this acquaintance at that home and "did not note any issues with the residence." *Id.* at ¶ 40. Indeed, the defendant "advised he will return to his long-haul truck and [the acquaintance's] home following the conclusion of these proceedings." *Id.* The government would ask that this residence in South Carolina serve as the location of the defendant's home detention. The defendant has been compliant with his conditions of pre-trial release.

Although this factor weighs in favor of probation, the other factors weigh in favor of a greater sentence.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

> Tr. at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant in this case has shown remorse for his actions. During a voluntary interview with the FBI, he gave a full account of his actions before and during the events of January 6. This account was consistent with surveillance footage. The defendant was cooperative throughout the interview, spoke in a calm but remorseful tone, and responded to questions with full answers. He admitted that his conduct on January 6 was a mistake and that he did not exercise good judgment that day. The defendant has made similar statements in hearings before this Court.

The defendant also has demonstrated that he understands the need to cooperate with law enforcement. When the FBI called him to ask that he turn himself in, he stopped his truck route and waited over a long weekend in Arizona to turn himself in the next business day.

The defendant has conveyed that he now understands the gravity of what happened on January 6. From his actions that day, it did not appear that he understood that at the time. The defendant climbed through a window that had been smashed open. When he did so, he was wearing

a respirator mask. He then traveled to a different section of the Capitol and took a picture of himself in front of a statue. All of this is unfortunate and concerning. A sentence of home detention, as opposed to probation, would further convey to the defendant that his conduct on January 6 had grave consequences and that it cannot happen again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Superseding Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

As described above, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or

otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same aggravating and mitigating factors present here, the Court may also consider the sentences imposed on Jessica Bustle and Joshua Bustle, 21-cr-238, for reference. The government understands that this Court is well aware of that case because the same judge assigned to that case is assigned to this one. In that case, the Court sentenced Jessica Bustle to two months' home detention and Joshua Bustle to one month of home detention. Both defendants entered the Capitol for about 20 minutes, which is similar to the 15 minutes in this case. Ms. Bustle wrote some inflammatory social-media posts in that case, which are not present here. However, the two months' home detention the government is requesting here is below the three months it requested for Ms. Bustle. Joshua Bustle did not have the same inflammatory social media and received a sentence of one month of home detention.

The government's recommendation of two months' home detention in this case corresponds with its request in Danielle Doyle, 21-cr-324, in which the government requested two

months' home detention after Ms. Doyle climbed through the same broken window that Mr. Hatley did. *See* ECF No. 27 for U.S. v. Danielle Doyle, 21-cr-324. She then, similarly to Mr. Hatley, traveled to various parts of the Capitol, took some photographs over a period of about 24 minutes, and later expressed remorse. *See id.* The government's recommendation is also in line with its recommendation of three months' home detention in Sean Cordon, 21-cr-269, in which the defendant witnessed rioters fighting with law enforcement outside the Capitol but entered anyway, entered through the same entrance that Mr. Hatley did, wore a vest of body armor and carried a gas mask, and filmed a boasting video while inside the Crypt. *See* ECF No. 31 for U.S. v. Sean Cordon, 21-cr-269.

The government recognizes that Mr. Hatley briefly climbed back out the window before climbing back in and that the government has sometimes requested incarceration for defendants who re-enter the Capitol. *See* Robert Reeder, 21-cr-166; Glenn Croy, 21-cr-162. However, here the gap between the exit and the re-entry was for only about two minutes, and the defendant was standing outside the window the entire time. This situation is thus very different from the situation in *Reeder*, where the defendant traveled an extensive distance around the Capitol after exiting and entered through an entirely different side, had negative interactions with police and filmed others who did so, and bragged extensively about his actions that day. *See* ECF No. 26 for U.S. v. Robert Reeder, 21-cr-166. It also differs from the situation in *Croy*, where the defendant traveled extensively throughout the Capitol while taking photographs, exited for about 40 to 45 minutes, re-entered and plowed through law enforcement into the Capitol rotunda with a large crowd of rioters, and bragged about his actions afterwards. *See* ECF No. 46 for US v. Glenn Croy, 21-cr-162.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Andrew Hatley to two months' home detention, three years of supervised probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his relatively limited role in the riot and his subsequent expressions of remorse.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Kevin Birney*
KEVIN BIRNEY
D.C. Bar No. 1029424
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W., Room 4828
Washington, D.C.  20530
Office: 202-252-7165
Kevin.birney@usdoj.gov